IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Matthew Ferguson,                    )
                                     )
            Plaintiff,      ) Case No. 1:06-CV-621
                                     )
      vs.                            )
                                     )
Quebecor World Johnson and    )
Hardin Company, <u>et al.</u>,      )
                                     )
            Defendants.     )

O R D E R

        This matter is before the Court on the motion for
summary judgment filed by Defendants Quebecor World Johnson and
Hardin Company and Quebecor World, Inc. (Doc. No. 18).  For the
reasons that follow, Defendants' motion for summary judgment is
well-taken and is **GRANTED.**

Background

        Plaintiff Matthew Ferguson presents claims for
disability discrimination, hostile work environment, and
retaliation pursuant to the Americans With Disabilities Act and
the Ohio Civil Rights Act arising out of the termination of his
employment with Defendant Quebecor World Johnson and Hardin
Company and Quebecor World, Inc. (collectively "Quebecor").

        Quebecor runs a commercial printing and manufacturing
facility, specializing in printing magazines and books, in
Lebanon, Ohio.  Plaintiff began employment with Quebecor in June
1997 as a pocket feeder in the bindery department.   As a pocket

feeder, Plaintiff was responsible for loading binding materials into the binding machine, quality control, and stacking finished books or magazines on skids. Plaintiff was also supposed to alert the operators of the machine with problems, or shut down the line if necessary. Plaint. Dep. at 34-39; 97-100 Plaint. Dep. Ex. 3. Plaintiff worked the night shift from 7:00 p.m. to 7:00 a.m. Plaint. Dep. at 41.

Plaintiff claims disability based on developmental impairments which inhibit his ability to communicate and process language. Complaint ¶ 7. Plaintiff was about 30 years old at the relevant times in this case. He had an individualized education program ("IEP") and was in special education throughout high school.[1] Plaintiff's test scores indicate that he is borderline mentally retarded. Thayer Dep. at 19. Plaintiff qualifies for services from the Ohio Rehabilitation Services Commission based on developmental disabilities. Id. at 20. Plaintiff received assistance in obtaining his job with Quebecor from Goodwill Industries and had a job coach during his first week of employment. Plaint. Dep. at 75-77. Plaintiff does not drive and lives with his parents. Id. at 11; 134. A common lay

---

[1] In general, an "individualized education program" or "IEP" is a written statement of goals, objectives, and programs or services requirements needed to ensure that a child with a disability receives a "free, appropriate public education" pursuant to the Individuals With Disabilities Education Act. Kings Local Sch. Dist. Bd. of Educ. v. Zelasny, 325 F.3d 724, 729 (6th Cir. 2003); 20 U.S.C. § 1414(d)(1)(A).

2

description of the manifestation of Plaintiff's claimed disability is that he is extremely shy. E.g., Straight Dep. at 17; Hall Dep. at 25-26; Moore Dep. at 20; Horning Dep. at 19-20; Mullins Dep. at 23.

Plaintiff graduated from high school, participated on the track team as a distance runner, and has run the Cincinnati Flying Pig Marathon three times. Plaint. Dep. 16-19. Plaintiff completed all but one class needed to enter the graphics arts program at Sinclair Community College. Plaint. Dep. Ex. 2. Plaintiff is able to assist with housework, cook meals, and groom himself. Plaint. Dep. at 133-34. Plaintiff testified that he was fully able to perform all of the functions of his position without any assistance or modifications. Id. at 33-41.

Insofar as this record is concerned, Plaintiff's employment at Quebecor was unremarkable through about early 2004. The evaluations of record show that Plaintiff's performance met expectations from May 2001 through June 2004. Doc. No. 22-5, at 22-32.

Plaintiff claims that in 2004, bindery machine operators Tim Maury and Kevin Moore began teasing him. Plaint. Dep. at 61-63.[2] Specifically, Plaintiff testified that Maury and

---

[2] Plaintiff testified that the teasing began in the fall of 2004, but it had to have occurred sometime before May 2004 based on the documentary evidence of the company's investigation into the harassment.

Moore called him "fatty, stupid, and dumb." Plaint. Dep. at 65. On at least several occasions, Moore called Plaintiff a "retard." Mullins Dep. at 30. In addition to the name calling, on two occasions Moore set magazines on fire in order to watch Plaintiff panic as he tried to stomp out the flames. Plaint. Dep. at 66-69.[3] Moore also sped up the line in order to watch Plaintiff panic. Id. at 137-38. Moore's teasing of Plaintiff was sufficiently hurtful that on one occasion he went to the lunchroom crying. Mullins Dep. at 26-27.

In any event, Plaintiff complained to his immediate supervisor, Marc Duval, about Moore and Maury right after the teasing began. Plaint. Dep. at 60-63; 70-71. Duval concluded that Moore and Maury had not singled out Plaintiff for teasing, and that in fact they were harassing the whole crew. Duval Dep. at 104. Duval, however, did not issue any formal discipline but rather told Moore and Maury that they needed to treat everyone with respect. Id. at 107. Plaintiff testified that after he complained to Duval, he was not called names or subjected to pranks again. Id. at 65; 138.

Plaintiff also told his parents about being teased at work, and in turn, they came to the plant on or around May 19, 2004 to make a complaint. Connor Dep. at 21-22; T. Ferguson Dep.

---

[3]     Mullins testified that Moore set magazines on fire once or twice a week, Mullins Dep. at 35, but Plaintiff said it only happened twice.

4

at 45. The Fergusons complained to Meaghan Connor, a staff member in the human resources department, that they believed that Plaintiff was being teased and discriminated against based on disability. Connor Dep. at 23.

The Fergusons' complaint prompted an internal investigation into Plaintiff's mistreatment. Connor gathered the information relative to the complaint and passed it along to Rick Ingalls, Quebecor's human resources and safety manager. Id. at 20-21. Ingalls and Quebecor's press maintenance manager, James Horning met with Duval and asked Duval to question Maury and Moore about the Fergusons' allegations. Horning Dep. at 54-57. Duval reported back that Maury and Moore denied that they were harassing Plaintiff. Id. at 57. In addition, during the course of the investigation, Duval reported to Ingalls deficiencies in Plaintiff's job performance. Duval Dep. Ex. 9. In a memorandum to the investigation file, Ingalls noted that "we need to counsel Matt relating to his performance issues and put him on a performance improvement plan if needed." Id. Plaintiff, however, was not put on a performance improvement plan at that time. Moore resigned from Quebecor in early May 2004, shortly after this investigation began. Moore Dep. at 30-31. Maury was transferred to work on another machine a few months later. Maury Dep. at 29. However, neither Moore nor Maury received any formal discipline for their conduct.

5

Plaintiff's next performance review was issued by Duval on June 7, 2004, only about two weeks after his parents came to the plant to lodge their discrimination complaint.  Doc. No. 22-5, at 32.  Although Plaintiff's raw score was one point lower than his prior annual review, he still received an overall rating of "meets expectations."  Id.  In January 2005, Plaintiff received a written counseling warning that he had 7.5 attendance occurrences and needed to stay below 9 occurrences to avoid termination.  Doc. No. 22-5, at 33.  Occurrence warnings came from the human resources department and not the employee's supervisor.  Duval Dep. at 41-42.

On May 8, 2005, Duval issued Plaintiff a written warning concerning the quality of his work.  Doc. No. 22-5, at 34. Specifically, the warning noted that Plaintiff was letting bad books go through the line without checking them and that he was stacking his skids in an unorganized manner.  Id.  In his deposition, Plaintiff agreed that the criticisms of the quality of his work noted in this warning were correct. Plaint. Dep. at 87-94.

On May 9, 2005, Duval completed a document entitled "Record of Conversation" concerning additional problems with Plaintiff's performance.  Doc. No. 22-5, at 37.  Duval reiterated issues with Plaintiff passing bad books and stacking books in an unorganized manner.  The impetus for this document was that

Plaintiff failed to shut down the line when the Arpac machine quit.  This resulted in plastic becoming wrapped around the conveyor belt and maintenance had to be called to make repairs. Id.  Plaintiff testified that Duval spoke with him about this incident.  Plaint. Dep. at 97-98.  Plaintiff also admitted that this incident occurred and that he failed to shut down the line as he was supposed to do.  Id. at 96-103.

These two incidents prompted Duval to recommend that Plaintiff be put on a thirty-day performance improvement plan ("PIP").  Duval Dep. at 55; 132.  The PIP essentially warned Plaintiff that if his quality of work did not improve by June 21, 2005, he could be terminated.  See Doc. No. 22-5, at 36-37. Plaintiff testified that he understood the PIP and the ramifications of not improving his performance.  Plaint. Dep. at 104-05.

Plaintiff's next performance review was dated June 6, 2005 and he received it on either June 13 or June 18, 2005.  Doc. No. 22-5, at 38; Plaint. Dep. at 111.  This time, Plaintiff received the lowest rating in each performance category and achieved an overall rating of "5," which is "below expectations." In the comments section, Duval stated:

> In the past year and especially in the past month, Matt's ability to perform his job description has been at an unacceptable level.  I am, for one, at a loss why his performance has declined so drastically in the past year.  Matt does not have any limitations that would

7

> keep him from performing at the skill level needed for
> his position.
>
> He has been written up for nonconformances twice and
> once for attendance in the past year and has been put
> on a performance improvement plan.  If for any reason,
> improvement does not occur during this improvement
> plan, I would suggest that we find alternative
> accommodations for Matt.

Id.  In his deposition, Plaintiff agreed that this was a fair and

accurate review of his performance.  Plaint. Dep. at 111-12.

On June 20, 2005, Duval recommended that Plaintiff be

terminated for committing a safety violation.  Duval Dep. at 51.

According to Duval, he received a report that Plaintiff had run

into another employee, Mike O'Dell, with a hand jack, which is

used to move skids, and knocked him into another piece of

machinery.  Id. at 175-76.  O'Dell received only a minor cut to

his foot, but at that point, Duval testified, he believed that

Plaintiff had become a safety hazard.  Id. at 176-78.  This

incident was, according to Duval, "the straw that broke the

camel's back."  Id. at 49.  According to Quebecor, as a result of

this accident and Plaintiff's continued poor performance, Ingalls

approved Duval's recommendation to terminate Plaintiff.  Ingalls

Dep. at 37-38.  Although Quebecor had a policy to maintain

records of workplace injuries, id. at 50, apparently no report of

this accident was filed.  Horning Dep. at 102-05.  On the other

hand, the internal personnel change form notes "Non conformance

[sic] to safety procedures.  Performance" as the reasons for

8

Plaintiff's termination.  Doc. No. 22-5, at 39.  The Court notes
that Plaintiff was not asked about this accident in his
deposition.  On the other hand, Plaintiff has not denied that the
accident occurred in any of his pleadings and has not filed an
affidavit denying that the accident occurred.  Plaintiff was
officially terminated from employment with Quebecor as of June
19, 2005.  Doc. No. 22-5, at 40.

        Following his termination, Plaintiff filed a complaint
of disability discrimination with the EEOC and received a right
to sue letter.  Complaint ¶ 6.  On September 20, 2006, Plaintiff
filed a complaint of disability discrimination, harassment, and
retaliation against Quebecor pursuant to the Americans With
Disabilities Act ("the ADA"), 42 U.S.C. § 12101, et seq., the
Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112, and Ohio
public policy.

        The case proceeded through discovery and now Quebecor
moves for summary judgment on each of Plaintiff's claims.
Plaintiff now concedes that his claim for disability
discrimination, harassment, and retaliation in violation of Ohio
public policy (Count V) is foreclosed by a recent decision of the
Ohio Supreme Court, Leininger v. Pioneer Nat'l Latex, 875 N.E.2d
36 (Ohio 2007).  Doc. No. 24, at 7 n.2.[4]  Accordingly,

---

        [4]    In Leininger, the Court held that Chapter 4112 of the
Ohio Revised Code provides complete relief to age discrimination
claimants.  Therefore, a claim for violation of public policy

Quebecor's motion for summary judgment as to Count V of the complaint is well-taken and is **GRANTED**.  This claim is **DISMISSED WITH PREJUDICE.**

The Court takes up the remaining issues concerning Quebecor's motion for summary judgment below in Part III.

## II. <u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962).  "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty</u>

---

based on age discrimination does not exist in Ohio.  <u>See</u> <u>id.</u> at 38 syl.  Although <u>Leininger</u> dealt with age discrimination, this Court has applied it in the context of  pregnancy discrimination. <u>Meyer v. Maxim Healthcare Serv., Inc.</u>, No. 1:06-CV-453, 2007 WL 3005947, at *9 (S.D. Ohio Oct. 12, 2007) (Spiegel, S.J.); <u>see also</u> <u>Lockett v. Marsh USA, Inc.</u>, No. 1:06CV00035, 2007 WL 2907894, at *13 n.8 (N.D. Ohio Oct. 3, 2007)(suggesting that <u>Leininger</u> applies to race and gender discrimination claims).

Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original).  The
Court will not grant summary judgment unless it is clear that a
trial is unnecessary.  The threshold inquiry to determine whether
there is a need for trial is whether "there are any genuine
factual issues that properly can be resolved only by a finder of
fact because they may reasonably be resolved in favor of either
party."  Anderson, 477 U.S. at 250.  There is no issue for trial
unless there is sufficient evidence favoring the non-moving party
for a jury to return a verdict for that party.  Id.

        The fact that the weight of the evidence favors the
moving party does not authorize a court to grant summary
judgment.  Poller v. Columbia Broadcasting System, Inc., 368 U.S.
464, 472 (1962).  "[T]he issue of material fact required by Rule
56(c) . . . to entitle a party to proceed to trial is not
required to be resolved conclusively in favor of the party
asserting its existence; rather, all that is required is that
sufficient evidence supporting the claimed factual dispute be
shown to require a jury or a judge to resolve the parties'
differing versions of the truth at trial."  First National Bank
v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

        Moreover, although summary judgment must be used with
extreme caution since it operates to deny a litigant his day in
court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert.
dismissed, 444 U.S. 986 (1979), the United States Supreme Court

has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  <u>Id.</u>; <u>Anderson</u>, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." <u>Id.</u>

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.[5]

### III. Analysis

As stated, Plaintiff presents claims for disability discrimination, harassment, and retaliation pursuant to the ADA

---

[5]    In his memorandum in opposition, Plaintiff cites a law review article for the proposition that granting summary judgment is a violation of the Seventh Amendment right to a jury trial. Ignoring for the moment the dubious precedential value of law review articles, this Court is obviously compelled to adhere to Supreme Court case law to the contrary.  See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 336 (1979)(citing Fidelity & Deposit Co. of Md. v. United States, 187 U.S. 315, 319-321 (1902)).  Moreover, the argument that Rule 56 summary judgment procedures violate the Seventh Amendment has not gained any traction among the district judges in this Circuit.  E.g. Hertenstein v. Western-Southern Fin. Group, No. 1:06-CV-243, 2007 WL 4365412, at *5 n.2 (S.D. Ohio Dec. 11, 2007)(Beckwith, C.J.); Massey v. Hess, No. 1:05-CV-249, 2007 WL 2725890, at *1 n.1 (E.D. Tenn. Sept. 17, 2007)(Collier, C.J.); Biegas v. Quickway Carriers, Inc., No. 05-73616, 2007 WL 1675140, at *2 (E.D.Mich. June 11, 2007)(Edmunds, J.).  Hopefully, this argument will be relegated to the field of academic discussion until stronger authority comes along.

and the Ohio Civil Rights Act.  The Court addresses these claims seriatim.

## A. Disability Discrimination

Federal evidentiary standards and burdens of proof apply to claims of employment discrimination filed pursuant to the Ohio Civil Rights Act.  Kaltenberger v. Ohio College of Podiatric Medicine, 162 F.3d 432, 435 (6th Cir. 1998). Therefore, federal case law applies to Plaintiff's state law disability discrimination claim.  Id.[6]  According, Plaintiff's federal and state claims may be analyzed together.

This case is a circumstantial evidence employment discrimination case.  A plaintiff can establish a case of disability discrimination through circumstantial evidence by showing that: 1) he is disabled; 2) he is otherwise qualified for the position with or without a reasonable accommodation; 3) he suffered an adverse employment decision; 4) the employer knew or had reason to know the plaintiff was disabled; and 5) the

---

[6]     There is one caveat.  Under the ADA, the plaintiff must demonstrate that the employer discriminated against him solely because of his disability.  Macy v. Hopkins County Sch. Bd. of Educ., 484 F.3d 357, 363 & 363 n.2 (6th Cir. 2007).  Conversely, under Ohio law, the plaintiff is only required to prove that his disability played at least a part in the employer's adverse employment decision.  Columbus Civil Serv. Comm'n v. McGlone, 697 N.E.2d 204, 206 (Ohio 1998).  The Court need not separately reconcile these different causation standards in this case because, as discussed later in this order, the record fails to establish any question of fact concerning whether Quebecor's reasons for terminating Plaintiff are pretextual.

position remained open while the employer sought other applicants or the plaintiff was replaced.  Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1186 (6th Cir. 1996).  If the plaintiff establishes these elements, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for its action. Id.  Once the employer meets this burden of production, the burden returns to the plaintiff to adduce evidence which shows that the employer's proffered reason is but a pretext for discrimination.  Id.  The ultimate burden of persuasion remains with the plaintiff at all times.  Id. at 1186-87.

In order to establish a prima facie case of disability discrimination, the plaintiff must prove that he is "disabled."

"Disability" under the ADA means:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  Under regulations promulgated by the Department of Labor, "physical or mental impairment" means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine;  or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome,

15

emotional or mental illness, and specific
learning disabilities.

29 C.F.R. § 1630.2(h)(1998).  "Major life activities" are

"functions such as caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, and

working."  29 C.F.R. § 1630.2(i) (1998).  "Substantially limits"

means:

> (i) Unable to perform a major life activity that the
> average person in the general population can
> perform;  or
>
> (ii) Significantly restricted as to the condition,
> manner or duration under which an individual can
> perform a particular major life activity as
> compared to the condition, manner, or duration
> under which the average person in the general
> population can perform that same major life
> activity.

29 C.F.R. § 1630.2(j)(1)(1998).  In determining whether an

individual is "substantially limited in a major life activity,"

the court should consider:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the
> impairment;  and
>
> (iii) The permanent or long term impact, or the
> expected permanent or long term impact of or
> resulting from the impairment.

29 C.F.R. § 1630.2(J)(2) (1998); see also Cehrs v. Northeast Ohio

Alzheimer's Research Center, 155 F.3d 775, 781 (6th Cir. 1998).

16

An employee is not disabled because he has been diagnosed with an impairment; rather, the employee is disabled when the impairment substantially limits a major life activity. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002). In making the determination whether the plaintiff is substantially limited in one or more life activities, the court must take into consideration any mitigating measures, both positive and negative. Sutton v. United Airlines, Inc., 527 U.S. 471, 482 (1999). "A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity." Id. at 482-83.

In this case, Quebecor argues that summary judgment should be granted in its favor because the record fails to establish that Plaintiff is "disabled" because he is not substantially limited in a major life activity. Quebecor further argues that Plaintiff was not "regarded as disabled." Therefore, according to Quebecor, Plaintiff cannot establish a prima facie case of disability discrimination. Alternatively, Quebecor argues that Plaintiff cannot demonstrate that its reasons for terminating him, namely his poor performance, are pretextual.

17

Assuming for purposes of the summary judgment motion that the record demonstrates that Plaintiff is "disabled" within the meaning of the disability discrimination statutes, the Court agrees with Quebecor that the record fails to disclose any question of fact concerning whether its reasons for terminating Plaintiff are pretextual.

An employment discrimination plaintiff may prove pretext in three ways:  1) by showing that the defendant's reasons had no basis in fact; 2) by showing that the reasons did not actually motivate the defendant; or, 3) by showing that the proffered reasons were not sufficient to warrant the action taken.  Kline v. Tennessee Valley Auth., 128 F.3d 337, 346 (6th Cir. 1997).  In his memorandum in opposition, Plaintiff argues that there is evidence from which a juror could conclude that Quebecor's reasons for terminating him have no basis in fact, or, alternatively, that the proffered reasons were insufficient to warrant his termination.

Plaintiff argues that a juror could find that Quebecor's reasons for terminating him have no basis in fact because there are no reports or records of the accident with the hand jack in its files.  In other words, Plaintiff argues that the lack of documentation of the accident could a lead a juror to conclude that Quebecor fabricated the whole incident to provide grounds for terminating him.  In order to show that the

18

employer's reasons have "no basis in fact," Plaintiff "must put forth evidence that the proffered bases for [his] discharge never happened, i.e., that they are factually false." <u>Abdulnour v. Campbell Soup Supply Co., LLC</u>, 502 F.3d 496, 502 (6th Cir. 2007) (internal quotation marks omitted). The absence of documentation concerning the accident might support a finding of pretext except for one flaw - <u>Plaintiff has not denied, in an affidavit or even through his lawyers in his brief, that the accident actually occurred</u>. Moreover, Plaintiff has not rebutted Duval's testimony that he witnessed the injury caused by the hand jack incident - the cut on Mike O'Dell's foot. Plaintiff cannot withstand summary judgment simply by arguing that the lack of documentation renders Duval's testimony that the accident occurred incredible.[7] See <u>Cox v. Kentucky. Dep't of Transp.</u>, 53 F.3d 146, 150 (6th Cir. 1995)("[A] nonmoving party may not avoid a properly supported motion for summary judgment by simply arguing that it relies

---

[7]     Plaintiff argues that Duval "recanted" his testimony because he testified that he issued Plaintiff a written warning for the hand jack incident, but then testified that the accident was "the straw that broke the camel's back" in making the termination decision. There is no inconsistency between these two statements. Obviously, an incident can merit both a warning to the employee and be the precipitating event which causes the employer to terminate the employee. This is particularly true in this case because the record shows that recommendations for terminating employees went through the human resources department for final approval. Horning Dep. at 45-47. Moreover, Duval's testimony is clear that it was the accident coupled with Plaintiff's poor performance that led him to recommend that Plaintiff be terminated. See Duval Dep. at 52-55.

solely or in part upon credibility considerations. . . .
[I]nstead, the nonmoving party must present affirmative evidence
to defeat a properly supported motion for summary judgment.").

Plaintiff further argues that a jury could find pretext
because Horning, Ingalls, and Duval gave varying accounts of the
process that resulted in his termination.  Plaintiff essentially
argues that a jury could find that Quebecor is lying because
there are discrepancies between these witnesses' accounts of who
was involved in discussions or meetings concerning whether to
terminate Plaintiff.  For instance, Plaintiff points out that
Horning said that he learned about the accident from an
unidentified employee when he arrived at work and that he never
conferred with Duval or received a recommendation from Duval
about terminating Plaintiff.  Plaintiff contends that these
discrepancies show that Quebecor is trying to remove
responsibility for the final decision to terminate him from
Duval, who he claims made statements demonstrating bias against
disabled persons.

The Court recognizes that in some cases the animus of a
subordinate employee can be imputed to the final decisionmaker.
Noble v. Brinker Int'l, Inc., 391 F.3d 715, 723 (6th Cir. 2004).
The plaintiff, however, is required to adduce evidence that the
employee's discriminatory motives somehow influenced the
decisionmaker.  Id.  Plaintiff has adduced no such evidence in

20

this case.  In context, Duval's alleged discriminatory comments
(set forth in the margin), are not directed toward Plaintiff or
disabled persons, but rather came in response to counsel's
suggestion that his parents were "watching out for him" by
lodging a complaint and that they were perhaps unaware that the
plant was a dangerous place to work.[8]

---

[8]    This is quite an extended passage, but it is important
to read the entire exchange to put it in the proper perspective:

> Q. You recall that Matt's parents played an active role
>    kind of in communicating with Quebecor World about Matt's
>    employment?
>
> A. Yes.
>
> Q. Okay. And it was your understanding that his parents did
>    that because of Matt's disability, and they kind of were
>    watching out for him? Matt still lived with his parents?
>
> A. Were they really watching out for him? Would you put your
>    "disabled," as you call him, son in a huge manufacturing
>    plant where there were machines and all kinds of -- would
>    you put that -- would you do that?
>
> Q. Well, I mean --
>
> A. No, would you do that?
>
> Q. I mean, maybe not, I mean, because --
>
> A. Maybe not? I wouldn't.
>
> Q. Because it's dangerous, I guess.
>
> A. I wouldn't.
>
> Q. It's particularly -- I suppose it's particularly
>    dangerous, you would say?
>
> A. You're damn right, it is.

21

Q. So maybe you take issue with -- well, you don't judge -- presumably, you don't judge them?

A. No, I don't, right.

Q. All right. But you would disagree -- you would formally disagree, like, without judging them, without being -- you're not angry toward them, right?

A. No, no, no.

Q. Without any kind of emotion, you would say it's not the wisest decision to throw someone disabled like Matt into a manufacturing facility with these big -- it's dangerous?

A. It's dangerous. It's dangerous for anybody. I could walk in there tomorrow and get my fingers cut off, my arm cut off. I mean, I --

Q. I mean, don't you think -- and again, back on the -- I think my question was that they were looking out for him, his parents.

A. Really?

Q. And maybe there is a distinction that we have to draw. Maybe they didn't realize how dangerous the environment was. Maybe they didn't realize that Matt didn't maybe belong in that environment, as opposed to them knowing that and recklessly, you know, knowing that it's a dangerous place and sending them to work anyway?

. . .

A. Rephrase the question.

. . .

Q. You're not saying that Matt's parents knew how dangerous it was and that they put him in there despite that, like with some ill intent or something, are you?

A. No, I'm not accusing them of that.

Q. They maybe did not have that experience?

22

In any event, these comments, proffered in a deposition more than two years after Plaintiff's termination, are too remote in time and unrelated to the termination decision itself to demonstrate pretext.  <u>Weigel v. Baptist Hosp. of East Tenn.</u>, 302 F.3d 367, 379 (6th Cir. 2002).

---

A. They knew it wasn't a McDonald's.

Q. Okay. But maybe they didn't have the experience that you had working in there?

A. I believe they had full knowledge of what went on there.

Q. Okay.

A. Would you?

Q. Well, I don't know.

A. You don't know? If you had a child that was disabled, and you sent them -- if you just saw the outside of the place, huge place, big thing sitting on the roof, smoke coming out, big 18-wheeler trailers sitting there on rows and rows of dock doors, you wouldn't -- what would you think? He was walking into -- what would you -- what would you do? Wouldn't you want to check it out, say, if your son or daughter was in that position? Yes, you would. So I would say they fully knew what was going on there. They absolutely knew.

Q. Okay.

A. There's no question.

Q. Okay. And so you then question whether they were looking out for Matt, sending him to that kind of an environment to work?

A. I wondered why they would.

Duval Dep. at 85-89.

Because the comments highlighted by Plaintiff do not demonstrate discriminatory animus or pretext, as Quebecor correctly argues, the differences in testimony in the process that led to Plaintiff's termination are not material.

Finally, Plaintiff argues that a jury could find that his performance deficiencies were insufficient to motivate his discharge because no one else had ever been terminated for having an accident like his.  Plaintiff also notes that other bindery helpers, such as Linda Mullins, were having difficulties keeping up with the production pace.  Plaintiff, however, has failed to adduce any evidence of a similarly-situated, non-disabled employee with a similar combination of performance deficiencies and a safety violation who was not fired.  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) ("[T]o be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").  Moreover, Plaintiff's performance deficiencies were more than just having difficulty with maintaining the pace of production.  As discussed earlier, Plaintiff had also failed to stack his skids in an organized manner and had failed to shut down the line, or notify

24

the operators, when problems occurred.  The latter problem resulted in the line being stopped and required maintenance to repair the machine.  Plaintiff simply has not identified any other employee who had the same set of performance problems but was not terminated.  Thus, a reasonable juror could not conclude that his poor performance was insufficient to motivate his termination.

There is no basis on this record from which a reasonable juror could conclude that Quebecor terminated Plaintiff solely because of his alleged disability or that his disability played a part in the decision to terminate him. Plaintiff admitted that the list of his performance deficiencies was accurate and that his performance reviews were fair. Plaintiff has not denied that the accident with the hand jack actually occurred.  Plaintiff has simply made no showing of pretext.

Accordingly, Quebecor's motion for summary judgment on Plaintiff's disability discrimination claims arising from his termination is well-taken and is **GRANTED.**

## B. Hostile Work Environment

Plaintiff also claims that he was subjected to a hostile work environment because of his disability.

A plaintiff establishes a hostile work environment "[w]hen the workplace is permeated with discriminatory

25

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Williams v. General Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999). A complainant must establish that the working environment was both subjectively and objectively hostile to satisfy this requirement. Id. at 560-61. To establish an objectively hostile environment, one must establish that a "reasonable person in the plaintiff's position, considering all the circumstances" would find the environment hostile. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998) (citation and internal quotation omitted). Accordingly, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)(internal citation and quotation marks omitted). In judging whether the plaintiff was subjected to a hostile environment, the trial court must be careful to consider the totality of the circumstances, as opposed to weighing the impact of each incident in isolation. Williams, 187 F.3d at 562-63.

In determining whether the work environment was objectively hostile, the trial court may consider the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or

26

a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). Other factors may contribute to a hostile work environment. For instance, the employer's failure to take action in response to harassing behavior may exacerbate the situation. <u>See</u> <u>Slayton v. Ohio Dept. of Youth Serv.</u>, 206 F.3d 669, 678 (6th Cir. 2000)(employer's failure to take action although it was aware of employee's harassing conduct contributed to hostile atmosphere).

Regarding harassment perpetrated by co-workers:

[T]he employer will only be liable if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment. Thus, an employer who implements a remedy can be liable for [disabiility] discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

<u>McCombs v. Meijer, Inc.</u>, 395 F.3d 346, 353 (6th Cir. 2005) (internal citation omitted). "Generally, a response is adequate if it is reasonably calculated to end the harassment." <u>Jackson v. Quanex Corp.</u>, 191 F.3d 647, 663 (6th Cir. 1999).

In this case, assuming that Maury and Moore teased Plaintiff and created a hostile work environment because of his alleged disability (a more than fair inference based on the nature of the conduct), Quebecor is not liable because its

27

response was not only calculated to end the harassment, it actually ended the harassment. As indicated, Plaintiff testified that after he complained to Duval, the harassment from Moore and Maury stopped and never occurred again. Although in his brief Plaintiff complains that Moore and Maury were not formally disciplined for harassing him, as Quebecor correctly points out, the employer is not required to allow the plaintiff to dictate his preferred remedy if its response to the harassment is otherwise adequate. <u>Bell v. Chesapeake & Ohio Ry. Co.</u>, 929 F.2d 220, 225 (6th Cir. 1991); <u>Mullholand v. Harris Corp.</u>, No. 94-3725, 1995 WL 730466, at **3 (6th Cir. Dec. 8, 1995)("Mullholand has no right to the response that she would have taken if she had been a supervisor at Harris.").[9]

There is no basis to impose employer liability for a hostile work environment in this case. Accordingly, Quebecor's motion for summary judgment on Plaintiff's hostile work environment claims is well-taken and is **GRANTED.**

## C. <u>Retaliation</u>

---

[9]     Plaintiff also claims that he suffered angst that he would be subjected to a hostile work environment because he learned that Quebecor intended to rehire Moore. Moore testified, however, that he did not return to Quebecor until January 2006, almost six months after Plaintiff was terminated. Moore Dep. at 39. Even then, Moore worked at the Red Bank facility and not the Lebanon facility where Plaintiff worked. Thus, the prospect of Moore's rehiring could not have contributed to Plaintiff's alleged hostile work environment as a matter of law.

Finally, Plaintiff claims that Quebecor retaliated against him for complaining about discrimination by terminating him.  In order to establish a prima facie case of retaliation, a plaintiff must establish that: 1) he engaged in activity protected by the discrimination statutes; 2) the exercise of his civil rights was known to the defendant; 3) thereafter, the defendant took an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action.  See Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107, 1118 (6th Cir. 1996), overruled on other grounds as recognized by Jackson v. Quanex Corp., 191 F.3d 647, 667 (6th Cir. 1999).  To establish the causal connection required in the fourth prong, the plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not participated in protected activity.  See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997); Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 377 (6th Cir. 1984).  The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.  See Avery Dennison, 104 F.3d at 861.

Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment

29

action.  Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994).  If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reasons proffered by the defendant are but a pretext for retaliation.  Id.  However, the burden of persuasion remains with the plaintiff at all times.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

In this case, the analysis of Plaintiff's retaliation claims replicates the analysis of his disability discrimination claims.  Again assuming that Plaintiff can establish a prima facie case of retaliation, there is no evidence which suggests that his performance deficiencies were not the true reason that Quebecor terminated him.  Contrary to Plaintiff's brief, Quebecor did not start papering his file with performance deficiencies in order to justify his termination.  Plaintiff conceded that his performance reviews were fair and that he was inadequate in the areas cited by Quebecor.  The Court need not recapitulate that analysis.

Quebecor's motion for summary judgment on Plaintiff's retaliation claims is well-taken and is **GRANTED.**

## Conclusion

In summary, for the reasons stated, the Court concludes that Plaintiff has failed to create any issue of material fact that he was terminated from employment by Quebecor for

30

discriminatory and/or retaliatory reasons.  Moreover, the record demonstrates that Quebecor adequately responded to Plaintiff's complaints of harassment because the teasing ceased and never reoccurred after he complained.  Consequently, Plaintiff's claims for disability discrimination and harassment, and retaliation, fail as a matter of law.  Accordingly, Quebecor's motion for summary judgment is well-taken and is **GRANTED** as to each of Plaintiff's claims.  The complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**

Date February 21, 2008                s/Sandra S. Beckwith
                                  Sandra S. Beckwith, Chief Judge
                                   United States District Court

31